WILLIAM ADAMS *vs.* LIBERTY MUTUAL INSURANCE COMPANY.

No. 02-P-31.

Middlesex. April 10, 2003. - November 20, 2003.

Present: LAURENCE, McHUGH, & COHEN, JJ.

*Consumer Protection Act,* Insurance. *Malicious Prosecution. Insurance,* Workers' compensation insurance, Fraud and concealment. *Workers' Compensation Act,* Insurer, Exclusivity provision, Fraud, Exhaustion of administrative remedies. *Statute,* Construction. *Administrative Law,* Exhaustion of remedies.

General Laws c. 152, § 24, the exclusivity provision of the workers' compensation statute, did not bar a chiropractor's claims against a workers' compensation insurer for malicious prosecution and violations of G. L. c. 93A and G. L. c. 176D, where the plain and unambiguous language of that statute did not identify a third-party medical provider such as the chiropractor as one of the classes of persons held to have waived their common-law and statutory rights of action. [63-66]

This court concluded that a chiropractor was not required to exhaust his administrative remedies by pursuing a fraud charge under G. L. c. 152, § 14(2), before the Department of Industrial Accidents (DIA), prior to filing claims in Superior Court against a workers' compensation insurer for malicious prosecution and violations of G. L. c. 93A and G. L. c. 176D, where § 14(2) explicitly conferred concurrent original jurisdiction over fraud claims on the Superior Court as well as the DIA; where the fraudulent conduct complained of did not fall within the scope of § 14(2); and where § 14(2) restricted the DIA's jurisdiction to consider fraud actions to those brought by an employee or an insurer, and not those brought by a third-party health care provider such as the chiropractor. [66-67]

CIVIL ACTION commenced in the Superior Court Department on July 2, 2001.

The case was heard by *Hiller B. Zobel,* J., on a motion for summary judgment.

*Lawrence W. Frisoli* for the plaintiff.

*Tamara S. Wolfson* (*Harvey Nosowitz* with her) for the defendant.

LAURENCE, J. After providing chiropractic treatment in Febru-

ary, 1992, to James Pittsley, an employee of Brake & Truck Supply, Inc., who had injured his right foot by dropping a brake shoe on it at work, Dr. William Adams sent the bill for his professional services[1] to Liberty Mutual Insurance Company (Liberty), the employer's workers' compensation insurer, in April, 1992. Liberty refused to pay on the basis of claimed billing irregularities.[2] Adams's subsequent effort, in December, 1992, to collect his relatively modest fee by filing a third-party claim against Liberty with the office of claims administration within the Department of Industrial Accidents (DIA)[3] produced nightmarish consequences for him.

Liberty resisted the claim and asserted a charge of fraudulent billing against Adams,[4] purportedly under G. L. c. 152,

[1]Pittsley received chiropractic treatment at Broadway Chiropractic Group, P.C. (Broadway), an entity wholly owned and directed by Adams, a licensed chiropractor. Adams did not personally treat Pittsley but was ultimately responsible for his care, for the medical report of the injuries sent to Pittsley's employer in February, 1992 (which shows two injuries, a sprain of the right foot and a lumbar sprain), and for the billing on Broadway letterhead. For all relevant purposes herein, Adams shall be deemed to have been the provider of and biller for the services to Pittsley.

[2]Liberty refused payment of Adams's claims on the ground that it had received two different sets of bills, each requesting payment in the identical amount of $540.85, but the second, unlike the first, contained references to treatment of the employee's lower back as well as his right foot.

[3]Adams filed his claim pursuant to G. L. c. 152, §§ 13 and 30. Section 30, as amended through St. 1991, c. 398, § 53, requires the insurer to "furnish to an injured employee adequate and reasonable health care services . . . together with the expenses necessarily incidental to such services . . . [and] the reasonable and necessary cost of such services shall be paid by the insurer." Section 13, as amended through St. 1991, c. 398, § 33, provides that "[r]equests for reimbursement for health services [to injured employees] under this chapter shall be signed by the person performing such service and shall be accompanied by a detailed description of the service rendered as well as the name and licensure number of the person performing such service . . . . No employee shall be liable for health care services adjudged compensable under this chapter." The procedures and documentation for filing claims for payment of health care services by a health care provider are set forth in 452 Code Mass. Regs. §§ 1.07(1), (2)(c) (1993).

[4]Liberty claimed (falsely, as it ultimately turned out) that it had already fully paid Adams's originally submitted bill in the amount of $540.85 for the treatment of the employee's right foot and alleged that Adams had attempted to defraud Liberty by altering the employee's medical records and billing a second time in an attempt to obtain unwarranted additional payments. Adams contended (correctly) that Liberty had never paid him anything, denied

§ 14(2).[5] After hearings, an administrative judge (AJ) of

Liberty's charge of fraud, and explained that discrepancies in the employee's medical records, which ultimately resulted in the differing invoices sent to Liberty, were the mistaken but inadvertent results of patient record restoration efforts undertaken after a virus had erased many patient treatment records in Adams's computer system.

[5]That statutory provision, as amended through St. 1991, c. 398, §§ 36-37, states in full:

> "If it is determined that in any proceeding within the division of dispute resolution, a party, including an attorney or expert medical witness acting on behalf of an employee or insurer, concealed or knowingly failed to disclose that which is required by law to be revealed, knowingly used perjured testimony or false evidence, knowingly made a false statement of fact or law, participated in the creation or presentation of evidence which he knows to be false, or otherwise engaged in conduct that such party knew to be illegal or fraudulent, the party's conduct shall be reported to the general counsel of the insurance fraud bureau. Notwithstanding any action the insurance fraud bureau may take, the party shall be assessed, in addition to the whole costs of such proceedings and attorneys' fees, a penalty payable to the aggrieved insurer or employee, in an amount not less than the average weekly wage in the commonwealth multiplied by six. A copy of any order or decision requiring the payment of penalties by an attorney under this section shall be referred to the board of bar overseers. Any expert medical witness who knowingly makes false statements in any medical report or deposition or who provides testimony of any kind in a proceeding under this chapter on behalf of a party he knows to be engaging in a fraudulent claim or defense, shall be subject to the same penalties applicable to attorneys herein. A copy of any order or decision requiring the payment of penalties by a physician under this section shall be reported to the appropriate board of registration. Any action provided in this subsection shall be brought by an employee or insurer in the department, or by an employee, employer or insurer in the superior court department of the trial court for the county in which the injury occurred or in the county of Suffolk; provided, however, that if presented to the superior court for the county of Suffolk, the court may, on motion of any party in interest, order the case removed to the superior court for the county in which the injury occurred."

The dispute occasioned by Liberty's allegations of fraud against Adams was assigned to an administrative judge within the division of dispute resolution, presumably under G. L. c. 152, § 10, as amended through St. 1991, c. 398, § 26, which contains a "catch-all" provision for assigning "a complaint from any party requesting resolution of any other issue [than an insurer's complaint requesting modification or discontinuance of benefits] arising under this chapter," and which encompasses disputes over an insurer's obligation to pay for medical services. See Locke, Massachusetts Workers' Compensation Reform Act § 9.2, at 223 (Koziol Supp. 2000). Both Liberty and the administrative judge referred to the controversy as being under

the DIA to whom Adams's claim had been assigned rendered a final decision on September 20, 1993, distinctly adverse to Adams. The AJ dismissed Adams's claim for payment upon determination that Liberty had paid the medical expenses associated with the injury to the employee's foot; that the employee had never received treatment from Adams for a work-related back injury; that Adams's proffered "computer glitch" explanation for the altered treatment records was not credible; and that "the alteration of these documents [was] . . . outrageous, egregious, and the basis of an attempt to defraud [Liberty]."

Invoking the provisions of G. L. c. 152, § 14(2), the AJ ordered Adams to pay Liberty's costs and attorney's fees in the sum of $3,500.00 and assessed a penalty of $3,259.80 against Adams (an amount equal to six times the then-average weekly wage in the Commonwealth, see note 5, *supra*).[6] He also forwarded a copy of his decision to the insurance fraud bureau (IFB)[7] and to the Board of Registration of Chiropractors (board of registration), purportedly but erroneously "as required by Section 14(2)."[8]

At least six months before the AJ "determined" under G. L.

---

§ 14(2), an inappropriate characterization of Liberty's allegations, because at the time of the assignment, no proceeding had taken place "within the division of dispute resolution" in which Adams had or could have made a misrepresentation in violation of the statute. See *infra* at 66-67. As a result, the administrative judge erroneously concluded that Adams had to be reported to the insurance fraud bureau (see note 7, *infra*) and the Board of Registration of Chiropractors (see note 8, *infra*), which directly led to the substantial injury and damages Adams claimed in the underlying litigation. Fraud in payment claims committed outside of the division of dispute resolution appears to be addressed by G. L. c. 152, § 14(3), which makes such conduct a crime and imposes upon conviction a significant criminal punishment (imprisonment in State prison for up to five years and a fine of up to $10,000) as well as restitution liability.

[6]Adams never argued that he was not subject to the penalty and cost provisions of G. L. c. 152, § 14(2), but only that the facts were insufficient to support a finding of fraud.

[7]The insurance fraud bureau of Massachusetts is not a State agency but a private entity, located in Boston and authorized by special act to combat insurance fraud in the workers' compensation and automobile insurance systems by investigating charges of such fraud and referring suspected violations for criminal prosecution. See St. 1990, c. 338; St. 1991, c. 398, § 99; St. 1996, c. 427, § 13.

[8]As discussed in note 5, *supra*, the dispute between Liberty and Adams erroneously proceeded as a G. L. c. 152, § 14(2), claim; but, even if it had been

c. 152, § 14(2), that Adams had knowingly made a false statement, Liberty had decided to act on its own initiative by complaining of Adams's alleged fraud to the IFB and requesting an investigation into his supposed "false billing." After considering the evidence against Adams provided by Liberty and conducting its own independent investigation of the claim, the IFB determined, in January, 1995, that there was insufficient evidence of criminal conduct to warrant further action against Adams. Despite keeping the file open for the receipt of any additional information bearing on Liberty's accusations against Adams and notwithstanding the AJ's final decision against Adams, the IFB did not thereafter pursue further investigation of Liberty's claim of Adams's supposed fraud.

The outcome of the AJ's referral of his decision to the board of registration was far less fortunate for Adams. On the basis of the administrative record and opposing memoranda, and without a hearing, the board of registration on September 11, 1996, ordered the revocation of Adams's license to practice as a chiropractor. The board of registration stated that, in light of Adams's "deceit and gross misconduct" in connection with the "fraudulent" billings to Liberty, it could "conceive of no circumstances under which [Adams's] license to practice chiropractic should be reinstated."[9]

Shortly before the board of registration's severe sanction, in May, 1996, Adams's administrative appeal had been rebuffed by the DIA reviewing board (reviewing board), which affirmed the AJ's decision, accepted Liberty's representation that it had paid the initial $540.85 bill for treatment to the employee's right foot, and explicitly upheld the AJ's finding, based on Liberty's contentions and evidence, that Adams had "falsely

properly brought under that provision, the mandatory reporting language of the statute applies only to "a physician" who has been penalized as a result of a formal DIA determination of fraud. A chiropractor such as Adams is not a "physician" under Massachusetts law. See and compare G. L. c. 112, §§ 2, 6, 89; G. L. c. 175, §§ 108B, 108D; G. L. c. 176B, §§ 1, 4, 4L, 7.

[9]Adams obtained a temporary stay of the board of registration's revocation order from a single justice of the Supreme Judicial Court, in an action he brought in the Supreme Judicial Court against the board of registration, until his appeal of the DIA reviewing board's decision had been resolved by this court.

altered" his billing "to induce the insurer to pay additional monies."

Adams appealed the reviewing board's decision to this court pursuant to G. L. c. 152, § 12(2). While that appeal was pending, Liberty, in June, 1996, commenced its own action — incautiously, as events proved — in Suffolk Superior Court, pursuant to G. L. c. 152, § 12(1), seeking enforcement of the reviewing board's decision with respect to the costs, fees, and penalties Adams had been ordered by the AJ to pay under G. L. c. 152, § 14(2). In its complaint, Liberty reiterated its charge of Adams's "fraud" in filing his claim for payment. Pursuant to Mass.R.Civ.P. 36, 365 Mass. 795 (1974), Adams filed requests for admissions upon Liberty in that action. Surprisingly, he obtained an unqualified admission from Liberty that it had never in fact made any payments to him for any treatment provided to the employee, Pittsley. (Liberty nonetheless denied, in defiance of the facts in the administrative record, that it had failed to disclose to the AJ or reviewing board its failure to pay Adams.)

On the basis of this newly discovered evidence, Adams obtained leave from this court in July, 1997, to move to reopen the decision of the reviewing board.[10] That same month the reviewing board allowed his motion to reopen the proceedings on his original claim and remanded the matter to the AJ "for such further action or findings as he deems appropriate."

Prior to hearings before the AJ in the reopened case, Adams moved to add a claim against Liberty under G. L. c. 152, § 14(2), on the ground that Liberty had knowingly committed fraud by failing to disclose its lack of payment and otherwise misrepresenting the facts in raising the defense charge of fraud against Adams.[11] The AJ refused to allow the claim to be joined and proceeded to conduct hearings on Adams's original claim into mid-1998, at which Liberty continued to charge

---

[10]Adams had earlier filed a motion with the reviewing board to reopen its decision in light of Liberty's admission, but the reviewing board denied the motion on the ground that it lacked jurisdiction while Adams's appeal was pending in this court.

[11]Adams also moved to join claims against Liberty under G. L. c. 152, § 14(1), for having "defended [against his claim for payment] . . . without reasonable grounds" and for having "prosecuted [its § 14(2) claim against Adams] . . . without reasonable grounds," but the AJ neither addressed nor

fraudulent behavior on Adams's part. On June 26, 1998, the AJ finally determined that, "in consideration of the new evidence introduced in the instant hearing specifically that . . . the original bill was never paid, and that the insurer was never actually billed for services relating to the employee's back, I find insufficient evidence to conclude that the third party claimant [Adams] . . . engaged in conduct consistent with [common law or] criminal fraud or an activity that violated the terms of § 14(2)."[12]

The AJ thereupon denied and dismissed Liberty's G. L. c. 152, § 14(2), fraud charge against Adams and ordered that all findings and orders in his original September, 1993, decision against Adams be vacated. Liberty appealed, continuing to contend that Adams had committed fraud, but the reviewing board in October, 1999, affirmed the AJ's new decision in Adams's favor. In the wake of these new developments, Adams and the board of registration entered into a stipulation before the Supreme Judicial Court in November, 2000, which vacated the board of registration's revocation of Adams's license to practice chiropractic medicine, reinstated that license (retroactive to the date it was revoked), and dismissed, with prejudice, Adams's pending appeal of the revocation.

Adams's seven-year ordeal had not inclined him to let bygones be bygones. He commenced the underlying action against Liberty in Superior Court in July, 2001, asserting counts for malicious prosecution and violations of G. L. c. 93A and G. L. c. 176D. He based his claims on Liberty's misrepresentations made over the years 1993-1999, including its false statements regarding Adams's bills and Liberty's supposed payment; its unilateral false complaint of insurance fraud to the IFB; its reiteration of fraud charges against Adams even after the IFB

---

mentioned that motion in his subsequent decision, an omission Adams has not challenged.

[12]The AJ also found that the total amount Adams had actually billed Liberty never varied from $540.85; that nothing submitted by Adams would have led to his receiving more for his services than he was otherwise entitled to; and that there was no evidence that Adams had ever knowingly introduced evidence known to be false "within the division of dispute resolution," as required for liability under G. L. c. 152, § 14(2), since it was Liberty which had introduced the allegedly fraudulent material in evidence, not Adams.

had found insufficient evidence and even after Liberty admitted never having paid Adams; its failure to disclose to the board of registration either its failure ever to have paid Adams or the AJ's dismissal of its factually erroneous fraud charges against Adams; and its continued allegations of Adams's fraud in its appeal of the AJ's decision exonerating Adams. Adams claimed that as a proximate result of Liberty's conduct, he had sustained physical and emotional pain and suffering, lost valuable property rights in the form of his license to practice chiropractic medicine and the six years of income he would have derived from it, and suffered serious damage to his reputation and standing in the medical community. He sought recovery of over $143,000 in attorney's fees and costs and $2,600,000 in lost income, to be trebled on account of Liberty's intentional misconduct and alleged failure to respond in a timely fashion to his G. L. c. 93A demand letter.[13]

Liberty did respond promptly to Adams's complaint by moving, pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974), to dismiss it on two grounds: first, that § 24 of G. L. c. 152, the Workers' Compensation Act, provided the exclusive remedy for allegations of misconduct by an insurer in the handling of workers' compensation claims; and second, that Adams had failed to exhaust his administrative remedies before the DIA (namely, by pursuing to conclusion the G. L. c. 152, § 14[2], fraud charges he had attempted to raise against Liberty in the reopened DIA proceedings). Treating Liberty's motion as one for summary judgment, a judge of the Superior Court allowed the motion and dismissed Adams's complaint, adopting by reference the two grounds advanced by Liberty without separate analysis.

We conclude that the judge erred. General Laws c. 152, § 24,

---

[13]The issue of the timeliness of Liberty's response to Adams's G. L. c. 93A demand for settlement was not argued or raised in the proceedings below or here. Liberty's eventual response rejected all of the factual and legal premises of Adams's asserted claims, denied any wrongful conduct, and refused to make a settlement offer.

The relief Adams demanded in his complaint did not expressly include payment of his original $540.85 bill for his services to Pittsley, suggesting that at some point Liberty had paid it, although nothing in the record so indicates.

does not bar Adams's common law and G. L. c. 93A claims, and the doctrine of exhaustion of administrative remedies is inapplicable to his complaint.[14]

*Exclusivity.* Liberty's exclusivity argument finds no support in the language of G. L. c. 152, § 24, as amended through St. 1991, c. 398, § 43, which provides in relevant part that:

> "An employee shall be held to have waived his right of action at common law . . . to recover damages for personal injuries, if he shall not have given his employer, at the time of his contract of hire, written notice that he claimed such right . . . . If an employee has not given notice to his employer that he preserves his right of action at common law . . . *the employee's spouse, children, parents and any other member of the employee's family or next of kin who is wholly or partly dependent upon the earnings of such employee* at the time of injury or death, *shall also be held to have waived any right created by statute, at common law* or under the law of any other

---

[14]To the extent Adams purported to assert a separate claim against Liberty under G. L. c. 176D (which is not at all clear from the language of his complaint), the judge would have been correct in dismissing it. Chapter 176D does not create a private cause of action to an aggrieved individual, see *Schwartz* v. *Travelers Indem. Co.*, 50 Mass. App. Ct. 672, 675-676 & n.4 (2001); and recourse for an individual injured by an insurer's G. L. c. 176D violation is available through G. L. c. 93A only to those plaintiffs able to sue under G. L. c. 93A, § 9, as consumers. See *Transamerica Ins. Group* v. *Turner Constr. Co.*, 33 Mass. App. Ct. 446, 452 (1992). That constraint is, however, of only immaterial technical significance here, since Adams could maintain his G. L. c. 93A action under G. L. c. 93A, § 11, on the basis of Liberty's unfair and deceptive conduct in dealing with his claim for payment, including Liberty's misrepresentations concerning it, within the confines of a business-to-business transaction between Adams and Liberty. See *Polaroid Corp.* v. *Travelers Indem Co.*, 414 Mass. 747, 754 (1993); *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. 610, 620 (1994). Under the indulgent standards applicable to the sufficiency of Adams's complaint in the face of Liberty's motion to dismiss, see *Nader* v. *Citron*, 372 Mass. 96, 98 (1977); *Brum* v. *Dartmouth*, 44 Mass. App. Ct. 318, 321-322 (1998), *S.C.* 428 Mass. 684 (1999), we have little doubt (notwithstanding the fact that neither the judge nor the parties addressed Adams's claims, in the context of a motion to dismiss, on grounds other than exclusivity and exhaustion) that the allegations of the complaint adequately constitute a claim for relief under G. L. c. 93A, § 11. See note 19, *infra*.

jurisdiction against such employer . . ." (emphasis added).[15]

This is crystal-clear statutory language. It unambiguously limits the persons who are held to have waived common-law and statutory rights to particular classes of an employee's family members and relatives. A third-party medical provider such as Adams is conspicuously not among those persons carefully identified as subject to G. L. c. 152, § 24, waiver.

We are constrained to follow and apply the literal (and entirely rational) command of such plain and unambiguous language. See *White* v. *Boston*, 428 Mass. 250, 253 (1998). Massachusetts appellate courts have consistently construed G. L. c. 152, § 24, narrowly, so as not to extend its exclusivity bar to the claims of anyone whom the Legislature has not seen fit explicitly to include therein. See *King* v. *Viscoloid Co.*, 219 Mass. 420, 423, 425 (1914); *Ferriter* v. *Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 523-525 (1980); *Corrigan* v. *General Elec. Co.*, 406 Mass. 478, 480 (1990); *Russell* v. *Boston Wyman, Inc.*, 410 Mass. 1005, 1005-1006 (1991).

Liberty's argument for imposing the bar of exclusivity on persons not mentioned in G. L. c. 152, § 24, because their claims in some way relate to or arise out of an insurer's handling of employee claims in the workers' compensation system is unsupported by any relevant authority and contrary to uniform precedent under § 24. It is also inconsistent with the ancient principle that common-law rights of action are not to be deemed taken away by a statute except by its explicit direction or by necessary implication. See *King* v. *Viscoloid Co.*, 219 Mass. at 425, and cases cited. The Supreme Judicial Court's rationale in *Ferriter* v. *Daniel O'Connell's Sons, Inc.*, remains applicable and mandates our rejection of Liberty's (and the motion judge's) erroneous construction of § 24: "The Legislature have stated the consequence that is to follow the failure [of an employee] to give the statutory notice [preserving common-law rights of ac-

---

[15]It is undisputed that the employee, Pittsley, gave no such notice as would preserve his common-law rights. It is also undisputed that a workers' compensation insurer is entitled to the protection of the exclusivity provisions of G. L. c. 152, § 24, where it is applicable, to the same extent as the employer. See *Matthews* v. *Liberty Mut. Ins. Co.*, 354 Mass. 470, 473 (1968).

tion]; how can the court say that further consequences shall follow, by taking away the right of a third person not mentioned in [§ 24]?"[16] 381 Mass. at 521, quoting from *King* v. *Viscoloid Co., supra* at 423.

The Legislature, aware of the appellate courts' narrow construction of G. L. c. 152, § 24, see generally *Condon* v. *Haitsma,* 325 Mass. 371, 373 (1950), carefully crafted amendments to § 24 after *Ferriter* that expanded the class of individuals subject to the exclusivity provision but only in the precise and limited manner that appears in the present statute. The Legislature's explicit restraint in that regard also demonstrates that it has not intended radical expansion of the scope of § 24 to include medical providers or any others not specifically mentioned therein merely because their claims in some way relate to those of injured employees. See *King* v. *Viscoloid Co.,* 219 Mass. at 425; *Cousineau* v. *Laramee,* 388 Mass. 859, 862 (1983); *General Elec. Co.* v. *Department of Envtl. Protection,* 429 Mass. 798, 803 (1999); *Triplett* v. *Oxford,* 439 Mass. 720, 726-727 (2003).[17]

Accordingly, the dismissal of Adams's complaint on the

---

[16]This rhetorical question is particularly applicable to one such as Adams, whose rights to reimbursement are not, contrary to Liberty's arguments, derivative of those of the employee but arise independently by virtue of the provisions of G. L. c. 152, §§ 13 and 30. See note 3, *supra.*

[17]As the Supreme Judicial Court observed, "[f]ew exclusive liability provisions in [other States'] workmen's compensation statutes are so narrowly drawn" as is our Commonwealth's. *Ferriter* v. *Daniel O'Connell's Sons, Inc.,* 381 Mass. at 525. Liberty's reliance on this court's opinions in *Boduch* v. *Aetna Life & Cas. Co.,* 26 Mass. App. Ct. 462, 465-468 (1988), and *Kelly* v. *Raytheon, Inc.,* 29 Mass. App. Ct. 1000, 1001-1002 (1990), is unjustified. Each case involved application of the exclusivity bar to causes of action asserted by an *employee* aggrieved by an insurer's delay in payment or failure to pay claimed workers' compensation benefits. Even less apt is Liberty's invocation of a California Supreme Court decision, *Charles J. Vacanti, M.D., Inc.* v. *State Compensation Ins. Fund,* 24 Cal. 4th 800 (2001). There, the California court held, inter alia, that third party medical providers' abuse of process and fraud claims against various workers' compensation insurers, on account of the insurers' alleged actions to delay, avoid, and otherwise intentionally mishandle the providers' claims for services to injured employees, were entirely derivative of the rights of the employees and thus barred by the California exclusivity provision to the extent they arose out of activities intrinsic to or a normal part of the workers' compensation claims process. Not only is this holding contrary to the language of § 24 and long-established Massachusetts precedent, but it is inapplicable in any event because of the

ground that it was barred by G. L. c. 152, § 24, was premised on an erroneous view of the law and must be reversed.

*Exhaustion.* Liberty's (and the judge's) reliance on the notion that Adams had to exhaust his administrative remedies by pursuing his G. L. c. 152, § 14(2), charge against Liberty is also erroneous, for three interconnected reasons.

First, G. L. c. 152, § 14(2), explicitly confers concurrent original jurisdiction over fraud claims on the Superior Court as well as the DIA, a circumstance that makes the doctrine of exhaustion inapplicable. That doctrine is one governing the timing of judicial review of administrative action, which comes into play only for "the determination of questions which the Legislature has left *in the first instance* to the [relevant agency]" (emphasis added). *Saint Luke's Hosp.* v. *Labor Relations Commn.,* 320 Mass. 467, 470 (1946). Further, it operates only "[i]n the absence of a statutory directive to the contrary." *East Chop Tennis Club* v. *Massachusetts Commn. Against Discrimination,* 364 Mass. 444, 448 (1973), quoting from *Gordon* v. *Hardware Mut. Cas. Co.,* 361 Mass. 582, 587 (1972). The provision for concurrent jurisdiction in § 14(2) is just such a statutory directive. See *Leahy* v. *Local 1526, Am. Fedn. of State, County, & Mun. Employees,* 399 Mass. 341, 346-347, 350-351 (1987) (no need for prior resort to agency when courts are invested with concurrent jurisdiction).

Second, as acknowledged by the AJ in his final decision exonerating Adams, G. L. c. 152, § 14(2), covers only fraudulent conduct committed "in any proceeding within the division of dispute resolution" (see note 5, *supra*), while Liberty's misrepresentations complained of by Adams as having caused his damages occurred outside of that division — in the IFB, the board of registration, the reviewing board, and the courts. See *Murphy's Case,* 53 Mass. App. Ct. 708, 713 (2002)

quite different California exclusivity statute, which is global in scope. The California statute provides that employer and insurer liability is restricted to that afforded by the workers' compensation statute "in lieu of any other liability whatsoever to any person" as "the sole and exclusive remedy" against employers and insurers whenever an employee suffers an injury compensable under the statute. *Vacanti,* 24 Cal. 4th at 812-813. As the court in *Ferriter* noted, 381 Mass. at 525 n.24, there is a "dramatic difference in language" between the Massachusetts exclusivity statute and those of most other states.

("Section 14[2] is explicit in its reference to 'proceeding[s] within the division of dispute resolution.' . . . If the Legislature had wished to embrace within the punitive measures of § 14[2] [other actions] . . . it could have so provided. Instead, it chose to limit the scope of § 14[2]").

Finally, G. L. c. 152, § 14(2), expressly restricts the DIA's jurisdiction to consider fraud actions to those "brought by an employee or [an] insurer," and therefore does not encompass — much less supersede — actions by other unspecified persons, including third-party health care providers.[18]

Even were G. L. c. 152, § 14(2) (see note 5, *supra*), applicable to Adams's action and the doctrine of exhaustion legally relevant to his situation, it would be inapplicable here under the well-settled "futility" exception. In this case, the "agency cannot afford [the] relief" sought, *Boston Edison Co. v. Selectmen of Concord*, 355 Mass. 79, 84 (1968), and resort to the DIA would be futile, because the administrative remedy that it could offer would be grossly inadequate. See cases cited in Cella, Administrative Law and Practice § 1723 & n.7 (1986 & Supp. 2002). Under § 14(2), the only monetary sanction for fraud is assessment of the costs of the DIA proceedings, associated attorney's fees, and a penalty amounting to, at most, a few thousand dollars. See note 5, *supra*. The DIA has no authority to compensate Adams for the claimed damage to his reputation, emotional pain and suffering, or multimillion dollar loss of professional income, or to impose the punitive remedy of multiple damages under G. L. c. 93A. The administrative remedy is self-evidently inadequate.

Moreover, there would be no jurisprudential purpose served by requiring Adams to resort to the DIA before going to court on his claims of fraud, misrepresentation, and unfair and decep-

---

[18]Contrary to Liberty's repeated assertions, no provision of G. L. c. 152 nor any Massachusetts decision states, implies, or stands for the proposition that the term "employee" includes all those who provide reimbursable services to an injured employee, or that such providers "stand in the shoes of the employee." Additionally, Liberty cites no authority, and we know of none, for its contention that, having attempted to initiate a fraud claim against Liberty under § 14(2) before the DIA, Adams was bound to pursue it to final decision there, a prospect that the just-quoted language of § 14(2) — not to mention the AJ's refusal to entertain the claim (see *supra* at 60-61) — makes inappropriate.

tive practices by Liberty. "The standards to be applied in an action for fraudulent misrepresentation are within the conventional competence of the courts, and the judgment of a technically expert [administrative] body is not likely to be helpful in the application of these standards to the facts of this case." *Nader* v. *Allegheny Airlines, Inc.*, 426 U.S. 290, 305-306 (1976).

In like fashion, when relatively conventional business and litigation conduct, such as Adams here complained of, is attacked under G. L. c. 93A as unfair and deceptive, when the agency has no authority to award c. 93A relief, and when there are essentially no disputed material facts, there is no occasion to require a litigant first to press its claims before the agency. This is particularly so when, as here, the transactions at issue are not complicated, do not involve any core workers' compensation principles, and call for no technical discretion or competence. See *Leahy* v. *Local 1526, Am. Fedn. of State, County, & Mun. Employees*, 399 Mass. at 349-350; *Columbia Chiropractic Group, Inc.* v. *Trust Ins. Co.*, 430 Mass. 60, 62-63 (1999).[19]

Similarly, an action for malicious prosecution is a common-law proceeding with which our courts have long-standing familiarity, since well before the creation of any administrative agencies. It focuses on "the right to be free from unjustifiable litigation," *Carroll* v. *Gillespie*, 14 Mass. App. Ct. 12, 18 (1982), quoting from *Foley* v. *Polaroid Corp.*, 381 Mass. 545, 552 (1980), and on traditional tort issues of reasonableness, probable cause, and malice — all concepts that courts have

---

[19]Adams's complaint states a sufficient claim for G. L. c. 93A relief on the basis of Liberty's alleged common-law misrepresentations. See *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. at 620, and cases cited. Further, drawing all necessary inferences in Adams's favor, he has set forth the requisite elements for a claim under G. L. c. 93A, §§ 2(*a*) and 11: a commercial interaction in a Massachusetts business context at the root of the controversy, significant loss of money and property, and a causal connection between Liberty's unfair and deceptive acts and the damages suffered as a foreseeable result thereof. See note 14, *supra*; *Kohl* v. *Silver Lake Motors, Inc.*, 369 Mass. 795, 800-801 (1976); *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 850 (1983); *Massachusetts Farm Bureau Fedn., Inc.* v. *Blue Cross of Mass., Inc.*, 403 Mass. 722, 729-730 (1989); *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 22-23, cert. denied, 522 U.S. 1015 (1997); *Coolidge Bank & Trust Co.* v. *First Ipswich Co.*, 9 Mass. App. Ct. 369, 370 (1980); *New England Insulation Co.* v. *General Dynamics Corp.*, 26 Mass. App. Ct. 28, 29-30, 33 (1988).

regularly dealt with and determined for generations and that require for their analysis and resolution no specialized knowledge or administrative expertise.[20]

*Disposition.* Because Adams's claims were not subject to the exclusive remedy provision of the Workers' Compensation Act and did not have to be prosecuted to exhaustion at the DIA, they were properly before the court. Accordingly, we reverse the judgment entered in favor of Liberty and remand the matter to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[20]See *Bacon* v. *Towne*, 58 Mass. 217, 235, 238-239 (1849); *Rosenblum* v. *Ginis*, 297 Mass. 493, 497-498 (1937); *Hubbard* v. *Beatty & Hyde, Inc.*, 343 Mass. 258, 260-262 (1961); *Beecy* v. *Pucciarelli*, 387 Mass. 589, 593-595 (1982); *Bednarz* v. *Bednarz*, 27 Mass. App. Ct. 668, 669, 672 (1989). Under these authorities, Adams's complaint adequately pleaded the essential malicious prosecution elements of lack of probable cause, malice, and ultimate termination of proceedings in his favor, and easily satisfied the standard for withstanding a motion to dismiss. See note 14, *supra*. At the very least, the issues whether a defendant acted in a reasonable manner with probable cause and without malice in the conduct alleged to constitute malicious prosecution "depends on all of the facts of the case," *Lincoln* v. *Shea*, 361 Mass. 1, 5 (1972), and cannot be determined by the court until "the facts are fully established or undisputed." *Id.*, quoting from *Muniz* v. *Mehlman*, 327 Mass. 353, 359 (1951). Those circumstances not obtaining here, summary judgment was improper as to Adams's malicious prosecution count.